**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-2163

ERIC GREENE
also known as
JARMAINE Q. TRICE

v.

JOHN A. PALAKOVICH; THE DISTRICT ATTORNEY OF
THE
PHILADELPHIA COUNTY; THE ATTORNEY GENERAL
OF THE
STATE OF PENNSYLVANIA

Eric Greene,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court  No. 2-04-cv-05200)
District Judge: The Honorable Clifford Scott Green

Argued March 8, 2010

Before: AMBRO, SMITH, and MICHEL,[*] *Circuit Judges*

(Filed: May 28, 2010)

Isabel K. McGinty (Argued)
152 Broad Street
Highstown, NJ 08520
        *Counsel for Appellant*

Susan E. Affronti (Argued)
Three South Penn Square
Philadelphia, PA 19107
        *Counsel for Appellee*s

---

OPINION

---

SMITH, *Circuit Judge*.

Eric Greene petitioned for relief under 28 U.S.C. § 2254 from his state court convictions for second degree murder, robbery, and conspiracy. This appeal requires us to resolve the thorny question of what the temporal cutoff is for determining "clearly established Federal law" for purposes of the

---

[*] The Honorable Paul R. Michel, Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

2

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") standard of review, set forth in 28 U.S.C. § 2254(d)(1). Based on the statute's text and Supreme Court precedent, we now hold that "clearly established Federal law" should be determined as of the date of the relevant state-court decision. Because the Supreme Court decision that Greene wishes to rely upon in his habeas petition, *Gray v. Maryland*, 523 U.S. 185 (1998), had not yet been decided at the time of the relevant state-court decision, he cannot show that his state court proceedings resulted in an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). Thus, we will affirm the judgment of the District Court denying Greene's habeas petition.

I.

*The Crime*

In early December of 1993, three or four men robbed a small family owned grocery store in North Philadelphia, and its owner, Francisco Azcona, died after being shot at point-blank range. When the robbers were unable to open the cash register, they picked it up and carried it out of the store, escaping in a station wagon parked nearby. A week after Mr. Azcona's murder, Greene, Julius Jenkins, Atil Finney, and Gregory Womack robbed a check cashing facility. They were apprehended shortly thereafter and the police seized a firearm.

3

Through ballistics testing, the police determined that the seized firearm was used in Mr. Azcona's murder. With this evidence, the police were able to make progress in the murder investigation.

*The Investigation*

In late February of 1995, Detective Robert Snell of the Philadelphia Police Department questioned Demond Jackson about his involvement in Mr. Azcona's murder. Jackson admitted that he was in the station wagon parked outside of the grocery store the night of the murder, but he claimed that he was simply getting a ride to West Philadelphia when the others stopped at the store. He described how several of them went inside and committed the murder. He also identified Jenkins as the shooter, and indicated that Naree Abdullah carried the cash register out of the store. According to Jackson, Finney entered the store with Jenkins and Abdullah, while Greene remained with the driver and Jackson in the automobile. Jackson added that the proceeds of the robbery were split among only five of the men, and that he did not take a share of the proceeds.

Armed with the information from Jackson, Detective Michael Gross of the Philadelphia Police Department questioned Finney in early March of 1995. Finney gave a statement to the police in which he admitted that he was one of the participants in the grocery store robbery and that he was inside the store at the time of the robbery. He identified Jenkins as the shooter,

4

implicated Greene as the robber who carried the cash register out of the store, indicated that Womack had driven the station wagon, and stated that another individual was involved in the robbery. Although Finney initially stated that five people were involved in the robbery, he later noted that there were six people in the car. A few days later, Detective Joseph Walsh of the Philadelphia Police Department questioned Womack. Womack gave a statement to the police in which he admitted he was the driver of the station wagon the night that Jenkins killed Mr. Azcona. In addition, he implicated Finney, Abdullah, and Greene in the robbery.

Shortly after these statements were obtained, first degree murder charges were filed against Jenkins. Greene, Finney, Womack, and Abdullah were charged with, *inter alia*, second degree murder, three counts of robbery, and conspiracy.

*The Trial*

Greene filed a pretrial motion seeking severance on several grounds. In that motion, he argued, *inter alia*, that a joint trial with his codefendants would be prejudicial because of the incriminating statements they had made to authorities. As support for his motion, Greene cited *Bruton v. United States*, 391 U.S. 123 (1968), and *Richardson v. Marsh*, 481 U.S. 200 (1987). During a pretrial hearing, Greene urged the trial court, the Court of Common Pleas of Philadelphia, to sever the trials because the statements of some of his non-testifying

5

codefendants implicated him and identified him as the person who carried the cash register out of the grocery store. The trial court, recognizing that the statements might be inadmissible at a joint trial, but also noting that redaction might resolve any problem of prejudice, posed a hypothetical to the parties:

> Judge: It's unusual to do this, but suppose the statement is redacted to say, "I didn't take the cash register." In other words, each defendant's statement would state --
>
> [Greene's Counsel]: I didn't take it.
>
> Judge: I didn't. Someone else took the cash register.
>
> [Greene's Counsel]: There's another nuance that I want Your Honor to know because your suggestion is brilliant. I just want to factor in one more thing. Of the three co-defendants who gave statements, indeed, Atil Finney says that my client took the cash register and Mr. Gregory Womack made the statement that my client was involved in that, but believe it or not, Julius Jenkins says that someone entirely different – he says that either Naree or another

6

person . . . took the cash register, either Womack or Naree, so you have Mr. Jenkins saying specifically that one of two other people took it – people involved, I might add, but not [Greene].

In response, the Court declared that the statements were not interlocking and inquired how the conflicting statements "pin point[ed]" Greene since the jury would have "information that three different people have been named as having taken the cash register." Greene's counsel replied that the Court's analysis was "excellent," but wondered how the Commonwealth would redact the statements. The Court replied that "it seems to me that the fair way to redact these [statements] is to refer to three different people." Greene's counsel responded: "As long as I would be allowed to argue in my closing speech that you heard what you heard and you heard that there were different people, then I would have no problem with [it]." The prosecutor offered to redact the statements so that "not one specific person carries out the cash register." Greene's counsel agreed that, under *Bruton*, such a redaction would remove any prejudice from the statements. Greene's counsel also pressed, without success, an additional basis for severance: that Jenkins, who would be tried alongside Greene, was facing a capital murder charge.

Greene's trial was held in February of 1996. At trial, Mr. Azcona's wife and sister-in-law identified Jenkins as the shooter, but they were unable to identify any of the other

7

robbers in the store or to state with certainty whether there were three or four men involved in the robbery.

Jackson, who had not been charged with any crimes associated with the robbery, was the prosecution's star witness. His testimony differed significantly from his statement to Detective Snell. Jackson testified that all of the occupants of the station wagon went into the store except for him and Womack. Contrary to his earlier statement that Abdullah picked up the cash register, Jackson testified that Greene took the cash register from the store. Jackson was cross-examined extensively on the differences between his earlier statement and his trial testimony. In addition, Greene attacked Jackson's credibility by highlighting that Jackson was present in Womack's station wagon but had not been charged with any crimes related to the robbery and that Jackson had outstanding drug charges.

The Commonwealth also called Detectives Gross and Walsh to testify about the statements they obtained from Finney and Womack. Neither Greene nor his codefendants objected to the reading of those statements in redacted form. Detective Gross read Finney's redacted statement, which substituted the nicknames or proper names of Finney's codefendants with the phrases "this guy," "other guys," and "two guys." The redacted statement also used the neutral pronouns "we" or "someone" in certain instances. For example, Finney's initial description of the robbery in its redacted form read:

8

We were riding around in this, this guy's car, me and three other guys were in the North Philadelphia. We -- when one said let's get paid. Everyone said okay and we saw this store. So me and two guys went in the store. When we got inside two guys stayed up front and I stayed to the back. One guy had his gun on the guy and was at the cash register getting the money, but it wouldn't open. I heard a shot and looked over. Blood was coming out of the guy's mouth. After that someone grabbed the register and we all ran out.

In at least one instance, when Detective Gross reached a portion of the statement where Finney was asked to identify "these guys" by their full names, the redaction simply deleted the names. The redacted answer stated: "One is and the other is." Later in the statement, when Finney was asked if he recognized anyone in certain photographs, the redacted answer stated: "Number three is. Number six is. Number eight is." The redacted statement also replaced the names of certain defendants with the word "blank" on four occasions. During Detective Gross's reading of the redacted statement, the trial court instructed the jury that Finney's statement could only be considered as evidence against him and not as evidence against any other defendant.

Detective Walsh, during his testimony, read a redacted version of Womack's statement. In it, Womack declared:

9

It was me and another guy. We were in the car, the other three went in the store. The car was around the corner and then they came out of the store carrying a cash register. As we pulled off the shooter said he shot the guy. I think someone asked him why did he shoot the guy? He didn't answer him. Then we drove up our neighborhood. Then we drove to someone's and we opened the register and got the money and we took the register and dumped it in a trash dumpster in a townhouse.

Although the redacted statement utilized neutral references such as "guy," "another guy," "someone," "someone else," "one," and "others," it replaced the names of some of the codefendants with the word "blank" on three occasions. The trial court did not give a limiting instruction following the reading of Womack's redacted statement, and neither Greene nor any of his codefendants requested such an instruction.

After closing arguments, the trial court issued a limiting instruction directing the jurors not to consider either redacted statement as evidence against any defendant other than the declarant. The jury found Greene guilty of second degree murder, three counts of robbery, and one count of conspiracy. The trial court sentenced him to life imprisonment.

*Subsequent Procedural History*

Greene filed a direct appeal with the Pennsylvania Superior Court.  Citing *Bruton*, Greene argued that his trial should have been severed from that of his codefendants because the statements implicating him "were not suitable for redaction." On December 16, 1997, the Pennsylvania Superior Court affirmed the judgment against Greene, addressing his *Bruton* claim on the merits.  The Court observed that the statements that were admitted into evidence "were redacted to remove any reference to the other defendants in the case" and "[t]he trial court instructed the jury on more than one occasion that such statements could only be considered as evidence against the defendants who made them."  In light of these observations, the Pennsylvania Superior Court concluded that *Bruton* was not violated and that Greene was not deprived of his right to confrontation.

Greene filed a timely petition for allowance of appeal with the Pennsylvania Supreme Court.  His petition argued, *inter alia*, that he had been deprived of his rights under the Confrontation Clause by the introduction of Womack's and Finney's statements.  As support for his position, Greene again cited *Bruton*.  While Greene's petition for allowance of appeal was pending with the Pennsylvania Supreme Court, the United States Supreme Court issued its decision in *Gray*.  In *Gray*, the Supreme Court stated that "considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions

11

as to warrant the same legal results." 523 U.S. at 195. Thereafter, the Pennsylvania Supreme Court granted Greene's petition for allocatur "limited to the issue of whether the common pleas court erred by denying the motion for severance thereby resulting in the violation of [Greene]'s Sixth Amendment right of confrontation upon the admission of statements given by his nontestifying codefendants." *Commonwealth v. Trice*, 713 A.2d 1144 (Pa. 1998). After granting the petition for allocatur, however, the Pennsylvania Supreme Court dismissed Greene's appeal as improvidently granted. *Commonwealth v. Trice*, 727 A.2d 1113 (Pa. 1999). Greene's conviction became final ninety days later, on July 28, 1999, when the time period for filing a petition for certiorari to the United States Supreme Court expired. *See Kapral v. United States*, 166 F.3d 565, 570-71 (3d Cir. 1999).

In early August of 1999, Greene sought relief from his conviction based on Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541-9546. In his PCRA petition, Greene argued that the trial court abused its discretion in denying the severance motion, and cited, *inter alia*, the prosecutor's summation, which allegedly improperly informed the jury that Finney's statement corroborated that the others on trial were implicated in the commission of the crime. The PCRA petition did not assert a Confrontation Clause claim as it failed to reference the redacted statements or to cite the Supreme Court's decisions in *Bruton*, *Marsh*, or *Gray*. The trial court dismissed Greene's PCRA petition as frivolous. Greene, acting

12

pro se, appealed the denial of his PCRA petition to the Pennsylvania Superior Court, asserting that the trial court erred by refusing to grant a severance. His argument cited only Pennsylvania authority regarding motions to sever multiple criminal charges. He did not refer to the Confrontation Clause, *Bruton*, *Marsh* or *Gray*. On December 31, 2003, the Pennsylvania Superior Court affirmed the dismissal of Greene's PCRA petition, noting that the severance claim had been finally litigated and could not afford him collateral relief. Greene filed another petition for allowance of appeal with the Pennsylvania Supreme Court, which denied allocatur.

This timely § 2254 petition followed. In his petition, Greene asserted, *inter alia*, that his trial should have been severed "due to antagonistic defenses, due to the fact a codefendant was subjected to the death penalty even though petitioner was not, and particularly due to the fact that effective redaction of the codefendant's [sic] statements, though attempted, was polluted by gross prosecutorial misconduct." In a comprehensive report, the Magistrate Judge to whom the petition had been referred recommended that Greene's petition be dismissed, but that a certificate of appealability be granted on the Confrontation Clause claim arising out of the introduction of Womack's and Finney's redacted statements at trial.

The Magistrate Judge struggled with whether to determine the "clearly established Federal law" under § 2254(d)(1) as of the date of the relevant state-court decision, as

13

instructed by Justice O'Connor in her portion of the majority decision in *Williams v. Taylor*, 529 U.S. 362, 403-412 (2000), or by the date Greene's conviction became final, as instructed by Justice Stevens in his portion of the majority decision in *Williams*, *id.* at 390. This issue was significant because it determined whether "clearly established Federal law" for purposes of Greene's § 2254 petition included the Supreme Court's decision in *Gray*. If the cutoff date was the date of the relevant state-court decision, *i.e.*, the Pennsylvania Superior Court's December 16, 1997 decision affirming Greene's convictions on direct appeal, that date preceded the Supreme Court's decision in *Gray*, and *Gray would not* be part of the "clearly established Federal law" applicable to this habeas petition.[1] But if the date Greene's convictions became final,

---

[1] We recognize that the Pennsylvania Supreme Court granted allocatur for Greene's appeal, which raised the Confrontation Clause claim and cited *Gray*, but then dismissed that appeal as having been improvidently granted. That dismissal cannot be treated as the relevant state-court decision, however, because it had no precedential value:

> In the circumstance where [the Pennsylvania Supreme Court has] accepted an issue by granting allowance of appeal, and [it], after conducting . . . review of the issue, enters an order dismissing the appeal as having been improvidently granted, the effect is as though [it] never granted allowance of appeal. In other words, a dismissal

14

July 28, 1999, was the pertinent cutoff date, *Gray*, which was issued more than a year earlier on March 9, 1998, *would* be "clearly established Federal law."

The Magistrate Judge ultimately determined that the controlling date for ascertaining the "clearly established Federal law" for Greene's habeas petition was the date of the relevant state-court decision. Accordingly, the Magistrate Judge applied the Supreme Court law existing at the time of the Pennsylvania Superior Court's December 16, 1997 decision, *Bruton* and *Marsh*, to determine whether Greene's § 2254 petition merited relief. He concluded that the Pennsylvania Superior Court did not unreasonably apply *Bruton* and *Marsh* in concluding that the redacted statements did not violate the Confrontation Clause and

> as being improvidently granted has the exact same effect as if [it] had denied the petition for allowance of appeal (allocatur) in the first place. Where we dismiss an appeal as improvidently granted, the lower tribunal's opinion and order stand as a decision of that court and this Court's order has no precedential value.

*Commonwealth v. Tilghman*, 673 A.2d 898, 904 (Pa. 1996) (emphasis omitted). Accordingly, even though there may have been some consideration of Greene's arguments by the Pennsylvania Supreme Court, there was no adjudication on the merits. Thus, the Pennsylvania Superior Court decision on direct appeal is the relevant state-court decision.

15

recommended that the District Court deny the § 2254 petition.

The Commonwealth objected to the Magistrate Judge's report, arguing that Greene had not procedurally exhausted his Confrontation Clause claim. The District Court overruled the Commonwealth's objections, noting that Greene presented a general claim regarding the redacted confessions and relied upon relevant Supreme Court authority, *Bruton* and *Marsh*. The District Court adopted the Magistrate Judge's report and recommendation. The Court denied the petition, but also granted a certificate of appealability limited to Greene's Confrontation Clause claim.[2]

## II.

Before us, the Commonwealth argues that Greene did not satisfy the fair presentation requirement because he consented to the redactions in the trial court and did not fairly present his Confrontation Clause argument to the Pennsylvania Superior Court.[3] It submits that Greene only raised the Confrontation

---

[2] The District Court exercised jurisdiction under 28 U.S.C. §§ 2241 and 2254, and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

[3] In *Picard v. Connor*, 404 U.S. 270, 275 (1971), the Supreme Court declared that "once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." It follows, therefore, that our review of whether a

16

Clause argument in his direct appeal to the Pennsylvania Supreme Court. We disagree.

The fair presentation requirement arises from the exhaustion doctrine pertaining to federal habeas review of state court decisions. *Picard v. Connor*, 404 U.S. 270, 275 (1971). Fair presentation requires giving the state court the "first opportunity to hear the claim sought to be vindicated in [the] federal habeas proceeding[.]" *Id.* at 276. In this first opportunity, the habeas petitioner need merely "present [the] federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999). In other words, the claims raised in the state courts must be substantially equivalent to the claim pressed in the federal court. *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir. 1996), *abrogated on other grounds by Beard v. Kindler*, __ U.S. __, 130 S. Ct. 612 (2009).

Greene fairly presented the factual and legal substance of his Confrontation Clause claim to the Pennsylvania state courts.

habeas petitioner has fairly presented his federal claim to the state courts is subject to the same standard of review that we employ in determining whether a habeas petitioner has exhausted his state court remedies. Accordingly, the question of whether Greene fairly presented his claim to the state courts is subject to plenary review. *See Ellison v. Rogers,* 484 F.3d 658, 660 (3d Cir. 2007).

17

On direct appeal, Greene presented his Confrontation Clause claim and the Pennsylvania Superior Court addressed the merits of that claim on the "basis of its substance, rather than on a procedural, or other ground." *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009) (citations omitted). Thus, Greene's direct appeal satisfied the fair presentation requirement. *Picard*, 404 U.S. at 275.

## III.

Having determined that Greene fairly presented his Confrontation Clause claim in the Pennsylvania state courts, we turn to a vexing issue that has, for the most part, evaded analytical discussion by the Supreme Court and the Courts of Appeals.[4] That is, whether "clearly established Federal law" under 28 U.S.C. § 2254(d)(1) is determined based on the "time of the relevant state-court decision," *Williams*, 529 U.S. at 412 (O'Connor, J., for the Court), the "time [the] state-court conviction became final," *id.* at 390 (Stevens, J., for the Court), or some combination thereof, *e.g.*, *Horn v. Banks*, 536 U.S. 266, 272 (2002) (per curiam) (holding that "in addition to performing any analysis required by AEDPA, a federal court considering a

---

[4] "Since the District Court ruled on [Greene's] habeas petition without an evidentiary hearing, our review of its decision is plenary." *Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009). We exercise plenary review over issues of statutory interpretation. *United States v. Lnu*, 575 F.3d 298, 300 (3d Cir. 2009).

habeas petition must conduct a threshold *Teague* [*v. Lane*, 489 U.S. 288 (1989),] analysis when the issue is properly raised by the state"). The Supreme Court, until recently, appeared to have settled on the date of the relevant state-court decision.[5] But the use of the date the petitioner's conviction became final has refused to quietly exit the stage. In recent months, the Supreme Court has noted the "uncertainty" surrounding the meaning of "clearly established Federal law" for the purposes of § 2254(d)(1). *Smith v. Spisak*, __ U.S. __, 130 S. Ct. 676, 681 (2010) (assuming that Supreme Court decision that was issued after the state supreme court affirmed petitioner's conviction, but before the date petitioner's conviction became final, constituted "clearly established Federal law"); *see id.* at 689 n.2 (Stevens, J., concurring) (supporting date conviction became final); *see also Thaler v. Haynes*, __ U.S. __, 130 S. Ct. 1171, 1174 n.2 (2010) (per curiam) (noting in dicta that a certain case could not have constituted "clearly established Federal law"

---

[5]     *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (O'Connor, J., joined by Rehnquist, C.J., and Stevens, Kennedy, Souter, Ginsburg, and Breyer, JJ.) (stating that AEDPA"require[s] us to limit our analysis to the law as it was 'clearly established' by [Supreme Court] precedents at the time of the state court's decision"); *but see Carey*, 549 U.S. at 78 (Stevens, J., concurring) (rejecting Justice O'Connor's formulation of "clearly established Federal law"); *Horn v. Banks*, 536 U.S. 266, 272 (2002).

19

because the case was "decided . . . nearly six years after [petitioner's] conviction became final and more than six years after the relevant state-court decision"); *see Brown v. Greiner*, 409 F.3d 523, 533 n.3 (2d Cir. 2005) (noting uncertainty caused by "inconsistent guidance" from the Supreme Court); *Newland v. Hall*, 527 F.3d 1162, 1198 n.62 (11th Cir. 2008) (noting uncertainty); *but see Foxworth v. St. Amand*, 570 F.3d 414, 430-32 (1st Cir. 2009) (declaring relevant state-court decision approach "untenable" and stating that Supreme Court precedent leads to the "inexorable conclusion" that the date the conviction became final is the correct approach).[6]

After careful consideration of the divergent approaches to determining what constitutes "clearly established Federal law" under § 2254(d)(1), we now hold that the date of the

---

[6] The uncertainty identified by the Supreme Court is present throughout our own admittedly contradictory § 2254(d)(1) jurisprudence. We have followed the "relevant state-court decision" approach without much fanfare in numerous cases. *E.g.*, *McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009); *Warren v. Kyler*, 422 F.3d 132, 138 (3d Cir. 2005); *Gibbs v. Frank*, 387 F.3d 268, 272 (3d Cir. 2004). We have also used the date the petitioner's conviction became final. *E.g.*, *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004). Indeed, it is not clear from our jurisprudence whether we recognized these divergent approaches because those cases did not require us to resolve whether the cutoff date was the relevant state-court decision date or the date the conviction became final.

relevant state-court decision is the controlling date. After surveying the questions that arise from the Supreme Court's *Williams* decision, and considering the statutory text and post-*Williams* Supreme Court precedent, our view is that using the date of the relevant state-court decision to determine "clearly established Federal law" is the most logical approach to applying § 2254(d)(1).

## A.

It is understandable that confusion surrounds what constitutes "clearly established Federal law." In discussing the meaning of the AEDPA amendments, the Supreme Court has held that the "statutory phrase ['clearly established Federal law'] refer[red] to the holdings, as opposed to the dicta, of [its] decisions *as of the time of the relevant state-court decision*." *Williams*, 529 U.S. at 412 (O'Connor, J., for the Court) (emphasis added). It has also held that all Supreme Court jurisprudence that would "qualify as an old rule under [its] *Teague* jurisprudence w[ould] constitute 'clearly established Federal law . . . ' under § 2254(d)(1)." *Id.*

These statements from Justice O'Connor present the first area of confusion in *Williams*. The most logical meaning for the term "old rule," a term that lacks any meaningful discussion post-*Williams*, is any rule which is not "new" under *Teague*. *See Teague*, 489 U.S. at 300-01 (plurality opinion). If that is the case, then an "old rule" is any rule that was "dictated by the

21

governing precedent existing at the time when [the petitioner's] conviction became final[.]" *Whorton v. Bockting*, 549 U.S. 406, 417 (2007) (defining new rule). In that event, the inclusion of old rules under *Teague* as "clearly established Federal law" would include Supreme Court decisions issued after the relevant state-court decision but before the petitioner's conviction became final. Such an outcome, in our view, contradicts Justice O'Connor's initial declaration that "clearly established Federal law" should be determined based on the date of the relevant state-court decision.[7]

---

[7] At least one of our sister circuits sees no contradiction in Justice O'Connor's statements. In *Foxworth v. St. Amand*, 570 F.3d 414 (1st Cir. 2009), the First Circuit concluded that *Williams* did not require the use of the "last reasoned state-court decision" to determine "clearly established Federal law" and endorsed the use of the date the petitioner's conviction became final. *Id.* at 431. That Court believed that Justice O'Connor expressly approved the use of *Teague* for determining "clearly established Federal law":

> Close perscrutation of *Williams* discloses nothing in the Court's constituent opinions that indicates any intention on Justice O'Connor's part either to modify or to undercut the bright-line rule of *Teague v. Lane*, 489 U.S. 288, 310 . . . (1989) (effectively limiting the consideration of new constitutional rules of criminal procedure in cases on collateral review to those rules announced before the petitioner's conviction became final).

> The opposite is true. Justice O'Connor's opinion stated that "whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1)." 529 U.S. at 412. That is a frank recognition that the AEDPA has neither altered nor eroded the marker laid down by *Teague*. This recognition is fully consistent with Part III of Justice Stevens's lead opinion, joined by Justice O'Connor; there, Justice Stevens stated that "[t]he threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became *final*." *Williams*, 529 U.S. at 390 (emphasis supplied).

*Foxworth*, 570 F.3d at 431. Based on this observation, the First Circuit concluded that "*finality*, not the date of the last reasoned decision, is the principal determinant of whether a 'new' rule can be applied to an 'old' case." *Id.* "Finality means that 'a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari [has] elapsed or a petition for certiorari [filed and] finally denied.'" *Id.* (quoting *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987)).

It cannot be denied that Justice O'Connor's approach, in light of her reference to old rules under *Teague,* can be read to permit the use of the date the conviction became final. That being said, the portion of the *Williams* decision referencing old

23

rules under *Teague* has largely fallen by the wayside in post-*Williams* Supreme Court decisions, *see infra* Section III(C). Moreover, the *Foxworth* Court's assertion that Justice O'Connor did not intend to "modify or to undercut the bright-line rule of *Teague*," 570 F.3d at 431, is not readily apparent from our reading of *Williams*. Justice Stevens's claim that AEDPA codified *Teague* did not garner the support of the majority. *See Williams*, 529 U.S. at 374-90. Instead, the majority sided with Justice O'Connor, who rejected Justice Stevens's view that § 2254(d)(1) had "no effect on the [pre-AEDPA] law of habeas corpus[.]" *Williams*, 529 U.S. at 404. Justice O'Connor's rejection of Justice Stevens's belief that AEDPA codified *Teague* most certainly suggests a desire on her part to undercut *Teague* and the significance of the date that a petitioner's conviction became final.

The *Foxworth* Court also suggested that using the date of the last relevant state-court decision would "subvert *Griffith* and deny criminal defendants the benefit of new Supreme Court precedent by the simple expedient of summarily affirming a lower court's decision." *Foxworth*, 570 F.3d at 432. It would also, according to the First Circuit, "give state courts a perverse incentive to avoid addressing constitutional claims in contemporaneous terms while insulating their actions from subsequent federal habeas review." *Id.* We disagree. The suggestion that a state appellate court would summarily affirm the judgment of a lower state court in an effort to undermine an individual's potential federal habeas petition is baseless. Moreover, the *Teague* rule itself, the rule that the First Circuit endorses, is premised on comity and respect for state court

24

decisions, *see Danforth v. Minnesota*, 552 U.S. 264, 280 (2008) (stating that "*Teague* . . . was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings"), not a presumption of malfeasance by state courts. To assume the latter defeats one of the main purposes of the *Teague* rule, to respect the finality of state-court convictions. If state courts cannot be trusted to properly adjudicate claims, then we would have no need to respect the resulting decisions.

More generally, we are unpersuaded by the First Circuit's robust support for Justice Stevens's approach. In our view, there is no clear answer to the issue we face. According to the *Foxworth* Court, though, interpreting § 2254(d)(1) to require the use of the date of the relevant state-court decision is simply "untenable," 570 F.3d at 431, as in "not able to be defended," *Merriam-Webster's Collegiate Dictionary* 1373 (11th ed. 2003). We cannot agree with that characterization. *See infra* Sections III(B) and (C). If *Griffith* truly "remove[d] *any* vestige of doubt," 570 F.3d at 431 (emphasis added), and *Teague* and *Griffith* together "le[d] to the *inexorable* conclusion," *id.* at 432 (emphasis added), that the date the petitioner's conviction became final is the correct date, why then, has the Supreme Court expressed uncertainty in its recent decisions? *See Spisak*, 130 S. Ct. at 681; *see also Thaler*, 130 S. Ct. at 1174 n.2. Perhaps the resolution of this issue by the Supreme Court would be a simple task, but resolution of the issue in the Courts of Appeals based on existing Supreme Court precedent is akin to trying to piece together a jigsaw puzzle that has been sprinkled with pieces from other puzzles. All the pieces, no matter how

25

To further complicate *Williams*, the Supreme Court also held that the "threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established *at the time his state-court conviction became final*." *Williams*, 529 U.S. at 390 (Stevens, J., for the Court) (emphasis added).[8]  Thus, the majority opinions of the Court, on their faces, offered differing interpretations of the "clearly established Federal law" language.

Supreme Court precedent after *Williams* has also raised questions.  At least some post-*Williams* authority suggests that the *Teague* test and § 2254(d)(1) are distinct inquiries.  *E.g.*, *Horn*, 536 U.S. at 272; *see Thaler*, 130 S. Ct. at 1174 n.2.  The instances where both tests must be met, however, are unclear.[9]  More importantly, it is also unclear whether the distinct nature of the two inquiries has any impact on how we approach the

---

they are arranged, simply do not fit.

[8]  Justice Stevens's reliance on the date the petitioner's conviction became final appears to be based on his position that § 2254(d)(1) codified *Teague*.  *See Williams*, 529 U.S. at 380.

[9]  At a minimum, when the state properly raises *Teague*, the federal court must conduct the *Teague* analysis.  *Horn*, 536 U.S. at 272.  Notably, the Commonwealth did not raise *Teague* in this case.

meaning of "clearly established Federal law" for the purposes of § 2254(d)(1).

In sum, we have (1) Justice O'Connor's majority opinion in *Williams*, which seems to contradict itself by stating that the date of the relevant state-court decision is the operative date for determining "clearly established Federal law" while simultaneously stating that Supreme Court jurisprudence that would qualify as "old rules" under *Teague* (which relies on the date the petitioner's conviction became final) is also "clearly established Federal law," (2) Justice Stevens's majority opinion in *Williams*, which contradicts Justice O'Connor's directive that we should look to the date of the relevant state-court decision, and (3) post-*Williams* Supreme Court authority suggesting that *Teague* and § 2254(d)(1) are distinct inquiries subject to independent analysis under certain circumstances.

While many courts have managed to avoid confronting these issues, *e.g.*, *Spisak*, 130 S. Ct. at 681, this case presents us with the inescapable obligation to decide the cutoff date for determining "clearly established Federal law." Greene's petition turns on whether he may invoke *Gray*; without that decision he cannot obtain relief. *See infra* Section IV. *Gray* was decided on March 9, 1998. Thus, using the date of the relevant state-court decision, the Pennsylvania Superior Court's December 16, 1997 decision, *Gray* would not be "clearly established Federal law." But using the date Greene's conviction became final, July 28, 1999, *Gray* would be "clearly

27

established Federal law." Indeed, Greene's case is the perfect storm of facts for resolving the issue of which date—the date of the relevant state-court decision or the date the state-court conviction became final—should be used for determining "clearly established Federal law" for the purposes of § 2254(d)(1).

B.

The text of § 2254(d)(1) supports using the date of the relevant state-court decision for determining "clearly established Federal law." Section 2254(d)(1) is concerned with "decision[s]" that were "contrary to" or "unreasonable application[s]" of "clearly established Federal law":

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

*Id.* The statute indicates that a "decision" results from a state court's adjudication "on the merits" of a claim. *Id.* In other words, the decision occurs when the state court has acted on the

28

substance of a petitioner's claim. *See Thomas*, 570 F.3d at 115 (concluding that "adjudicated on the merits" means that the state ruling resolved the claim "on the basis of its substance, rather than on a procedural, or other ground"). Thus, it is the state court's resolution of the petitioner's claim that must be "contrary to" or an "unreasonable application" of existing Federal law to justify granting habeas relief. 28 U.S.C. § 2254(d)(1); *see Newland*, 527 F.3d at 1199 (holding that "the highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision").

Given that AEDPA is concerned with the review of the state court's decision on the merits of the petitioner's claim, the statute, read in the most straightforward fashion, requires that the relevant Federal law be "clearly established" at the time of that state-court *decision*. 28 U.S.C. § 2254(d)(1).[10] Reading the language plainly, "clearly established" contemplates that the law or precedent *existed* at the time of the state court's substantive resolution of the petitioner's claim. *Cf. United States v. Atiyeh*, 402 F.3d 354, 364 (3d Cir. 2005) ("Congress kn[o]w[s] how to use the past tense."). A state court cannot unreasonably apply a Supreme Court decision that did not exist at the time of its decision. *See Priester v. Vaughn*, 382 F.3d 394, 400 (3d Cir.

---

[10] Notably, the phrase "clearly established Federal law" did not have any special meaning for federal habeas review prior to AEDPA and it bears no overt connection to any language used in *Teague*.

29

2004) (noting that the Pennsylvania Superior Court "did not act unreasonably in failing to predict the Supreme Court's decision in *Gray*").  The same is true for the "contrary to" prong of the statute.

C.

Supreme Court decisions after *Williams* further bolster our conclusion.  In *Lockyer v. Andrade*, 538 U.S. 63 (2003), the Supreme Court stated unequivocally that "'clearly established Federal Law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Id.* at 71-72.  The same test was repeated in *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004), and *Carey v. Musladin*, 549 U.S. 70, 74 (2006).  *Accord* 1-2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure*, Fifth Edition § 2.4 (stating that the date for determining "clearly established Federal law" for § 2254 petitions is "the date of the state court decision"); 2-32 *id.* § 32.3 ("Section 2254(d)(1) limits federal review to legal rules that actually were *in effect* when the state court decided the case.").

The date the conviction became final, on the other hand, has not gained much traction in the Supreme Court.  Aside from stating that *Teague* and § 2254(d)(1) are distinct inquiries, *Horn*, 536 U.S. at 272, and that in certain circumstances both *Teague* and § 2254(d)(1) must be satisfied, *id.*, the Supreme Court has

30

not suggested that the date the conviction became final has any import in determining "clearly established Federal law" for the purposes of § 2254(d)(1). In fact, it appears that Justice Stevens's majority opinion language from *Williams* stating that the "threshold question" is whether the petitioner seeks to apply a rule that was clearly established at the time his state-court conviction became final, *Williams*, 529 U.S. at 390, has been supplanted by *Lockyer*, where the Supreme Court agreed that the "threshold matter" was to decide what constituted "clearly established Federal law," but then used the *relevant state-court decision date* to determine that law, 538 U.S. at 71. The most telling observation regarding the use of the date the conviction became final is that the strongest authorities we have found for that approach are the recent Supreme Court opinions expressing uncertainty on which date is appropriate. *See Spisak*, 130 S. Ct. at 681; *see also Thaler*, 130 S. Ct. at 1174 n.2. Mere uncertainty cannot counterbalance the numerous Supreme Court decisions that have unequivocally, albeit without analysis, taken the other approach. As an inferior federal court, we are not free to ignore the numerosity of these pronouncements.

Moreover, it appears that Justice Stevens's primary concern with Justice O'Connor's formulation of the "clearly established Federal law" inquiry is her view that the phrase "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions[.]" *Williams*, 529 U.S. at 412 (O'Connor, J., for the Court). In *Carey*, Justice Stevens explained that he took issue with Justice O'Connor's formulation because it

31

discouraged state courts from seeking guidance from the Supreme Court's decision on the grounds that such guidance was dicta:

> Virtually every one of the Court's opinions announcing a new application of a constitutional principle contains some explanatory language that is intended to provide guidance to lawyers and judges in future cases. It is quite wrong to invite state court judges to discount the importance of such guidance on the ground that it may not have been strictly necessary as an explanation of the Court's specific holding in the case. The text of [AEDPA] itself provides sufficient obstacles to obtaining habeas relief without placing a judicial thumb on the warden's side of the scales.

*Carey*, 549 U.S. at 79 (Stevens, J., concurring) (citations omitted). This concern exists independent of the date upon which "clearly established Federal law" is determined and is not implicated in the issue we decide today. The decisions preceding *Gray*—*Bruton* and *Marsh*—explicitly refused to provide guidance on whether the teachings of *Bruton* applied to redactions like the ones made in this case. *See infra* Section IV.

In conclusion, we hold that the cutoff date for determining "clearly established Federal law" for purposes of § 2254(d)(1) is the date of the relevant state-court decision. Both the natural reading of the statutory text and post-*Williams* Supreme Court precedent support this conclusion. As such,

32

*Gray* was not "clearly established Federal law" for the purposes of Greene's habeas petition.

## D.

Before applying our holding to the facts in this case, a brief segue is needed to address our dissenting colleague's spirited defense of the use of the date the petitioner's conviction became final to determine "clearly established Federal law." While we recognize that the issue confronted today is one over which reasonable jurists may disagree, there are some notable deficiencies in the dissent's proposed adjudication of this case. The dissent (1) would *sub silentio* codify *Teague*, including its retroactivity exceptions, as part of § 2254 without any reasoned justification for doing so, (2) erroneously asserts that *Griffith v. Kentucky*, 479 U.S. 314 (1987), applies to cases on collateral review, and (3) incorrectly asserts that our approach to § 2254(d)(1) creates a "twilight zone," preventing a petitioner from relying on Supreme Court decisions issued after the date of his last relevant state-court decision, but before his conviction becomes final.

### 1.

As already explained in Section III(A), there is direct Supreme Court precedent supporting the view that "whatever would qualify as an old rule under [the Supreme Court's] *Teague* jurisprudence will constitute 'clearly established Federal

law, . . . ' under § 2254(d)(1)." *Williams*, 529 U.S. at 412 (O'Connor, J., for the Court). But the dissent appears to go one step further. It alludes, at times, to the retroactive application of new rules that fall within the *Teague* exceptions for retroactivity as "clearly established Federal law" for purposes of § 2254.[11]

As a preliminary observation, this case does not raise a *Teague* new rules retroactivity issue. Under *Teague*, *Gray* would be an old rule since it was issued before Greene's conviction became final. Thus, comments on the supposed benefits of *Teague*'s new rule retroactivity exceptions would be dicta even if we were to take the dissent's approach. That being said, we caution that the use of *Teague*'s new rule retroactivity exceptions for purposes of § 2254, while not implausible, *see* 28

---

[11] "In *Teague*, [the Supreme Court] explained that unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Horn*, 536 U.S. at 271 (internal quotation marks omitted). There are two exceptions to the general rule. "The first exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe . . . or addresses a substantive categorical guarantee accorded by the Constitution[.]" *Id.* n.5 (internal quotation marks omitted). "The second exception is for watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* (internal quotation marks omitted).

U.S.C. § 2254(e)(2)(A)(i) (contemplating retroactive applications of "new rule[s] of constitutional law"), *id.* § 2244(d)(1)(C) (same), has yet to gain support from the Supreme Court. In fact, in *Horn*, the Supreme Court explained that the "AEDPA and *Teague* inquiries are distinct." 536 U.S. at 272. As distinct inquiries, it is unclear whether *Teague*'s new rule retroactivity exceptions should be incorporated into § 2254 even if we were to adopt the use of the date the petitioner's conviction became final for determining "clearly established Federal law."

Indeed, the *Horn* decision recognized that satisfaction of § 2254(d) is the *minimum* required for a petitioner to receive habeas relief:

> While it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review set forth in 28 U.S.C. § 2254(d) ("an application . . . shall not be granted . . . *unless*" the AEDPA standard of review is satisfied (emphasis added)), none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard, or that AEDPA relieves courts from the responsibility of addressing properly raised *Teague* arguments.

*Id.* Thus, under *Horn*, if *Teague* is in play at all, it is as an additional concern on top of AEDPA's requirements codified in § 2254(d). *See id.* As such, it seems a leap to assume that new

35

rules that are deemed retroactive under *Teague* would be automatically deemed "clearly established Federal law" for purposes of § 2254(d)(1).

2.

The dissent's assertion that *Griffith* applies on collateral review cannot be reconciled with that decision's holding. In *Griffith*, the Supreme Court considered whether a certain decision "applie[d] retroactively to a federal conviction then pending on *direct review*." 479 U.S. at 320 (emphasis added). It held that a newly declared rule "for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on *direct review* or not yet final[.]" *Id.* at 328 (emphasis added). The principles animating *Griffith* were the ideas that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication," *id.* at 322, and that courts should treat like cases alike, *id.* at 323.

The dissent, citing *Whorton*, seeks to take *Griffith*, a decision animated by constitutional principles pertaining to treating like cases alike on direct review, and apply it to collateral review. It sees *Whorton* as "explicitly" recognizing that *Griffith* applies to collateral review. Neither *Whorton* nor subsequent Supreme Court precedent support this view.

The language from *Whorton* upon which the dissent

36

relies is far from explicit. *See* 549 U.S. at 416. The sole citation of *Griffith* was for the proposition that under the "*Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review." *Id.* Before assuming that the Supreme Court sought, without any additional discussion, to extend *Griffith* to collateral review, as the dissent suggests, a less novel understanding of the *Whorton* Court's reliance on *Griffith* should be considered. Namely, that *Griffith* was probably cited as general support for the propositions that "an old rule applies. . . on direct . . . review [and that] a new rule is generally applicable only to cases that are still on direct review." *Whorton*, 549 U.S. at 416. The sentence following the *Griffith* citation in the *Whorton* decision further confirms this understanding by explaining how new rules apply in collateral proceedings through citation to *Teague*, not *Griffith*. *Id.*

Subsequent Supreme Court precedent also belies the dissent's view that *Griffith* applies on collateral review. Approximately a year after *Whorton*, the Supreme Court, in *Danforth v. Minnesota*, 552 U.S. 264 (2008), stated that *Griffith* "defined the scope of constitutional violations that would be remedied on direct appeal." *Id.* at 275 n.11. It did so in the context of determining whether "*Teague* constrains the authority of state courts to give broader effect to new rules of criminal procedure than is required by that opinion." *Id.* at 266. Rather than holding that *Teague* applied to the state courts, like *Griffith*, 479 U.S. at 328, the Supreme Court reached the opposite

37

conclusion.  It held that the *Teague* decision did not control a state court's decisions on retroactivity.  According to the *Danforth* Court, the *Teague* decision "limits the kinds of constitutional violations that will entitle an individual to relief on federal habeas, but does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague*."  *Danforth*, 552 U.S. at 282.  The Supreme Court emphasized that *Teague*, unlike *Griffith*, was based on the Court's "power to interpret the federal habeas statute."  *Id.* at 278.  Because "*Teague* is based on statutory authority that extends only to federal courts applying a federal statute, it cannot be read as imposing a binding obligation on state courts."  *Id.* at 278-79.  While *Griffith* is concerned with affording individuals on direct review their right to adjudication in accord with the Constitution, *Teague* is derived from language in the habeas statute permitting disposal of habeas petitions "as law and justice require[.]"  *Id.* at 278 (citing 28 U.S.C. § 2243).  Because their sources of authority are different—*Griffith*, the Constitution, and *Teague*, 28 U.S.C. § 2243—and their motivations are different, *Griffith* cannot be imported wholesale into *Teague* without discussion.  In short, we do not dispute that *Griffith* may somehow inform the Supreme Court's approach in applying *Teague*.  We also do not dispute that a § 2254 petition may invoke *Griffith* where a petitioner was denied the application of relevant Supreme Court precedent on direct review.  But *Griffith*, independently, does not control retroactivity for cases on collateral review.

38

3.

The dissent also asserts that our approach creates a twilight zone for any petitioner who seeks to invoke Supreme Court decisions that fall between the date of the last relevant state-court decision and the date the petitioner's conviction became final. This assertion is incorrect. Our holding does not create a categorical bar to a petitioner's reliance on Supreme Court decisions issued during any twilight zone period. Instead, we set forth a simple rule: the universe of "clearly established Federal law" that may be applied to a particular petitioner's § 2254 appeal is tied to the date of his last relevant state-court decision.

In this case, it was *Greene's decision* not to raise the Confrontation Clause claim in his PCRA petition that established December 16, 1997, as the date of the last relevant state-court decision on the merits.[12] This, in turn, shrank the

---

[12] The dissent asserts that Greene would not have been able to raise his Confrontation Clause claim in a PCRA petition because the issue had been previously litigated on the merits by the Pennsylvania Superior Court. *See* Pa. Cons. Stat. § 9543(a)(3); *id.* § 9544(a). We disagree. "[T]he 'previously litigated' rule codified in § 9544(a) simply relieves Pennsylvania courts of the burden of revisiting issues which are res judicata." *Boyd v. Warden*, 579 F.3d 330, 369 (3d Cir. 2009) (en banc). The Pennsylvania Superior Court's decision on direct review held only that Greene's "right to confrontation as set

forth in *Bruton*" was not violated. The Confrontation Clause claim presented in Greene's PCRA petition would have been based on *Gray*, a "discrete legal ground," *Commonwealth v. Collins*, 888 A.2d 564, 570 (Pa. 2005), for relief that was separate from the grounds set forth in *Bruton* and *Marsh*. *See Marsh*, 481 U.S. at 211 n.5 (stating that the Supreme Court "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun").

Unlike the comparatively loose fair presentation requirement for a § 2254 petition, which requires that the habeas petitioner need merely "present [the] federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted," *McCandless*, 172 F.3d at 261, the PCRA requirement that an issue not have been previously litigated "refers to the discrete legal ground raised and decided on direct review," *Collins*, 888 A.2d at 570. While raising *Bruton* on direct appeal to the Pennsylvania Superior Court was sufficient to put the state courts on notice that a federal claim was being asserted, satisfying the fair presentation requirement, *McCandless*, 172 F.3d at 261, the Pennsylvania Superior Court's decision was limited to whether *Bruton* required that Greene have been granted a severance at trial. Thus, for purposes of the PCRA, that decision did not bear on whether *Gray*, "a discrete legal ground" that was not "decided on direct review," *Collins*, 888 A.2d at 570, would have provided Greene relief.

In addition, we do not consider the authorities cited by

40

the dissent persuasive given the facts of this case. The dissent cites *Commonwealth v. Small*, 980 A.2d 549 (Pa. 2009), for the proposition that reliance on a "different case to support the original theory," *id.* at 569, of relief would not "change the fact that [an] issue was previously litigated," *id.* But that proposition was offered based on different factual circumstances. In *Small*, the petitioner was seeking to rely on United States Supreme Court authority that existed at the time of his direct appeal yet was not raised in that appeal to effectively re-argue an issue that was previously litigated on direct appeal. *Id.* The *Small* Court had no reason to view the issue as novel because the underlying United States Supreme Court authority existed at the time of the direct appeal. Here, *Gray* did not exist at the time of the Pennsylvania Superior Court's decision. As such, Greene would not be simply raising a theory or allegation in support of a discrete legal ground for relief that *existed* at the time of his direct appeal. Instead, he would be asserting a *new* discrete legal ground for relief based on previously unavailable United States Supreme Court precedent.

The dissent's reliance on *Commonwealth v. Washington*, 927 A.2d 586 (Pa. 2007), is similarly misplaced. There, the petitioner argued that *Gray*, which had been decided after his direct appeal to the Pennsylvania Supreme Court but before that court's decision became final, entitled him to relief under the PCRA. *Id.* at 608-09. The Pennsylvania Supreme Court found that the petitioner's Confrontation Clause claim had been previously litigated on the merits, but its conclusion was not based on the fact that it had already considered the petitioner's *Bruton* claim. *Id.* at 609. On direct review, the Court assumed

41

*arguendo* that the petitioner's right to confrontation had been violated by the use of the word "blank" in a redacted statement and then held that the error was harmless and did not prejudice him. *Id.* In other words, it assumed that the rule later set forth in *Gray* existed and held that, despite the violation of that rule, the petitioner could not receive relief. In its PCRA review, the Court took note of *Gray*, which supported the proposition of law it had already assumed on direct appeal, and concluded that it had already considered the substance of that claim on direct review. *Id.* As such, *Washington* does not support the dissent's view that *Gray* and *Bruton* raise the same issue for purposes of PCRA review.

Finally, we note that the PCRA's requirement that an issue not have been previously litigated is flexibly applied by the Pennsylvania courts to avoid injustice, not create it. The Pennsylvania legislature, "by its effort to channel the broadest category of post-conviction claims into the statutorily-prescribed procedures . . . implemented a scheme that must necessarily be deemed to take into account facets of traditional habeas corpus jurisprudence . . . under which previous litigation does not function as a never-yielding bar to the possibility of collateral relief." *Commonwealth v. Cruz*, 851 A.2d 870, 877 (Pa. 2004) (citations omitted). "[I]n . . . instances involving unique circumstances embodying manifest error or irregularity in the chain of previous litigation, th[e] [Pennsylvania Supreme] Court and others have found that the doctrine need not be regarded as dispositive on collateral review." *Id.* Thus, even if we credit the dissent's view that Greene's issue was previously litigated, his PCRA petition was not doomed from its outset. The

42

universe of "clearly established Federal law" available to him for his § 2254 petition, relative to what that universe would have been had he pursued the Confrontation Clause claim at the PCRA stage and obtained a later, post-*Gray* state-court decision on the merits. It is unfortunate for Greene that the body of "clearly established Federal law" as of December 16, 1997, did not include the *Gray* decision. Yet this is an outcome he could easily have avoided by raising the Confrontation Clause claim in his PCRA petition. Doing so would have pushed the date of the last relevant state-court decision on the merits forward, thereby expanding the universe of "clearly established Federal law" to include *Gray*.

Using the date of the last relevant state-court decision to determine "clearly established Federal law" gives defendants incentive to pursue all colorable claims based on "Federal law" as far as possible in the state courts because doing so will give them the best chance of success in federal habeas proceedings, not to mention the underlying state proceedings. This is a salutary effect that serves Congress's goals in passing AEDPA. *See* 28 U.S.C. § 2254(b) & (c) (requiring exhaustion of state court remedies); *Duncan v. Walker*, 533 U.S. 167, 181 (2001)

---

Pennsylvania Supreme Court's dismissal of Greene's petition as improvidently granted on direct review, in combination with the United States Supreme Court's issuance of the *Gray* decision, could be the kind of "irregularity in the chain of previous litigation," *id.*, that would merit relaxation of the requirement that an issue not have been previously litigated.

43

(referencing "clear purpose to encourage litigants to pursue claims in state court prior to seeking federal collateral review").[13]

## IV.

Having concluded that *Gray* was not "clearly established Federal law," Greene is left to argue only *Bruton* and *Marsh*. Accordingly, we must determine whether the Pennsylvania Superior Court unreasonably applied those cases when it decided that the redactions of Finney's and Womack's statements did not violate Greene's rights under the Confrontation Clause.[14] In *Bruton*, the defendant challenged his

---

[13] Notably, our approach does not create a *procedural* bar to Greene's claim. As explained in Section II, Greene satisfied the exhaustion requirement by fairly presenting his Confrontation Clause claim to the Pennsylvania Superior Court. Satisfaction of the exhaustion requirement, however, does not open the door to Supreme Court decisions issued after the last relevant state-court decision. The determination of what constitutes "clearly established Federal law" for purposes of § 2254 is a merits-based determination. Whether a petitioner has fairly presented and exhausted his claim in the state courts, in contrast, is a procedural issue that we decide independent of the merits of the petitioner's claim.

[14] "[T]he 'unreasonable application' prong of 28 U.S.C. § 2254(d)(1) requires a habeas petitioner to show that the state court's application of Supreme Court precedent was 'objectively

conviction on the basis that his right to confront the witnesses against him was violated because the confession of his non-testifying codefendant, which directly implicated him, was introduced into evidence. 391 U.S. at 123. The Court of Appeals had affirmed the defendant's conviction because the jury had received a limiting instruction that the codefendant's confession was competent evidence against only the codefendant. The Supreme Court reversed, holding that

> because of the substantial risk that the jury, despite instruction to the contrary, looked to the incriminating extrajudicial statements in determining the [defendant's] guilt, admission of [the codefendant's] confession in this joint trial violated [the defendant's] right of cross-

unreasonable.'" *Fountain v. Kyler*, 420 F.3d 267, 273 (3d Cir. 2005). "[A] federal court's mere disagreement with the state court's application of Supreme Court precedent is not sufficient; rather, a state court adjudication fails the 'unreasonable application' test only if the state court identified the correct governing legal rule but unreasonably applied it to the particular case or if the state court either unreasonably extended a legal principle from Supreme Court precedent to a new context in which it should not apply or where it unreasonably refused to extend such a principle to a new context in which it should apply." *Id.* We do not address the "contrary to" prong of § 2254(d)(1) as the Pennsylvania Superior Court correctly identified *Bruton* as the controlling legal authority. *See Williams*, 529 U.S. at 406.

> examination secured by the Confrontation Clause of the Sixth Amendment.

*Id.* at 126. The Court acknowledged that the instructions to the jury were clear, *id.* at 137, but reasoned that

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id.* at 135-36 (citations omitted). Accordingly, the Court refused to accept the limiting instruction as an adequate substitute for the constitutional right of cross-examination. *Id.* at 137.

Two decades later, the Supreme Court revisited *Bruton* in *Marsh*. In that case, the nontestifying codefendant's "confession was redacted to omit all reference to [Marsh]-indeed, to omit all indication that *anyone* other than [two other individuals] participated in the crime." 481 U.S. at 203. Nonetheless, Marsh filed a § 2254 petition, alleging, *inter alia*, that the introduction of her codefendant's confession violated her rights under the Confrontation Clause. The Supreme Court began its analysis by pointing out that *Bruton* was a "narrow

46

exception" to the accepted principle that jurors are presumed to follow their instructions. *Id.* at 207. It noted that there was "an important distinction between this case and *Bruton*, which cause[d] it to fall outside the narrow exception," as Marsh's codefendant's confession did not expressly implicate her and became incriminating "only when linked with evidence introduced later at trial ([Marsh]'s own testimony)." *Id.* at 208.

> The *Marsh* Court observed that
>
> > evidence [in a statement] requiring linkage differs from evidence incriminating on its face in the practical effects which application of the *Bruton* exception would produce. If limited to facially incriminating confessions, *Bruton* can be complied with by redactions—a possibility suggested in that opinion itself.

*Id.* at 208-09. After considering the difficulties that would arise if *Bruton* was "extended to confessions incriminating by connection," the Court rejected a rule that would outright prohibit the use of a codefendant's confession. *Id.* at 209. Consistent with its recognition that "confessions that do not name the defendant" are different than *Bruton*, which involved a facially incriminating confession, the Court held that

> > the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to

47

eliminate not only the defendant's name, but any
reference to his or her existence.

*Id.* at 211.  In a footnote, however, the *Marsh* Court made clear
that it was not expressing an "opinion on the admissibility of a
confession in which the defendant's name has been replaced
with a symbol or neutral pronoun."  *Id.* n.5.

*Bruton* and *Marsh* instruct that: (1) unredacted
confessions by codefendants that implicate the defendant are
generally inadmissible, *Bruton*, 391 U.S. at 126; (2) redacted
confessions that completely sanitize a codefendant's statement
by removing any reference to a defendant's name and existence
are generally admissible, *Marsh*, 481 U.S. at 211; and (3) when
a redaction is utilized to avoid a violation of the Confrontation
Clause there must be a limiting instruction to the jury.  Neither
*Bruton* nor *Marsh* clarified the middle ground regarding the
method for satisfactorily redacting a nontestifying codefendant's
confession.  Indeed, *Marsh* declared that it was not addressing
the admissibility of redacted statements that utilize neutral
pronouns, such as the redactions of Finney's and Womack's
statements that were admitted in Greene's trial.  *Id.* at 211 n.5.

In light of these principles, pre-*Gray* "courts generally
followed the practice of redacting co-defendants' statements in
order to eliminate all explicit reference to other defendants on
trial."  *Priester*, 382 F.3d at 398.  Consistent with that practice,
the Pennsylvania Superior Court recognized that the redaction
of a codefendant's statement was a permissible mechanism for

48

avoiding a *Bruton* violation. It reviewed the redacted statements that were admitted and noted that, consistent with *Bruton* and *Marsh*, all references to the other defendants by proper name or nickname had been removed. The Pennsylvania Superior Court also noted that the jury had been properly instructed that it could only consider each redacted statement as evidence against the individual who made the statement and that these statements could not be considered in deciding any other defendant's culpability for the crimes charged. As such, the Pennsylvania Superior Court concluded that Greene's rights under the Confrontation Clause had not been violated.

In light of *Bruton* and *Marsh*, the Pennsylvania Superior Court's conclusion was not unreasonable. Unlike *Bruton*, which involved two individuals, and *Marsh*, which involved three, the robbery in this case involved five or six individuals. As a result, Finney's and Womack's redacted statements did not directly implicate Greene. Moreover, the substitutions that were used for the names of the codefendants yielded confusing statements that failed to establish either the number of persons involved or, except for the shooter, the role that each person played in committing the offense. In the absence of a redaction that expressly implicated Greene, it was not unreasonable for the Pennsylvania Superior Court to conclude that the jury would follow the limiting instructions it had received.

V.

This case presents a vexing conundrum that cannot, no matter how one views the facts or law, be avoided. While we cannot predict with absolute certainty what date the Supreme

49

Court would use to determine "clearly established Federal law" for purposes of § 2254(d)(1), our decision today represents a careful consideration of the pertinent, conflicting authorities, and we believe that we have reached the best conclusion given the guidance we have to date.  Ultimately, only the Supreme Court can resolve such uncertainty as exists.  For now, we hold that "clearly established Federal law" for purposes of § 2254(d)(1) should be determined as of the date of the relevant state-court decision.  In this case, because the Pennsylvania Superior Court's December 16, 1997 decision did not unreasonably apply the "clearly established Federal law" that existed at that time, *Bruton* and *Marsh*, we will affirm the judgment of the District Court.

Eric Greene v. John A. Palakovich, et al.
No. 07-2163

---

AMBRO, <u>Circuit Judge</u>, concurring in part and dissenting in part

Although I agree with my colleagues that Greene's claim is not procedurally defaulted and join Part II of the majority opinion in full, I respectfully disagree with their determination of the controlling date for "clearly established Federal law" under 28 U.S.C. § 2254(d)(1). As my colleagues recognize, the authority on this question is conflicting and, save for a First Circuit Court opinion, unreasoned. But choosing the date of the relevant state-court decision, as our Court does today, leaves a twilight zone between the cutoff set by the majority here and the retroactivity analysis of the Supreme Court's decisions in *Griffith v. Kentucky*, 479 U.S. 314 (1987), and *Teague v. Lane*, 489 U.S. 288 (1989) (plurality).[1] The consequence of the majority's opinion today is that a criminal defendant who is denied the right under *Griffith* to apply a new constitutional rule to his or her case on direct appeal is left without later recourse to federal *habeas* review to correct that error.

---

[1] "Although *Teague* was a plurality opinion that drew support from only four members of the Court, the *Teague* rule was affirmed and applied by a majority of the Court shortly thereafter." *Danforth v. Minnesota*, 552 U.S. 264, 266 n.1 (2008) (citation omitted).

## I.      Background

To set the stage here, Greene argued prior to his state trial that proceeding jointly against him and his co-defendants would prejudice his defense and his constitutional right to confront witnesses "when the Commonwealth offer[ed] into evidence [out-of-court] statements made by the co-defendants." He cited for support the Supreme Court cases then known—*Bruton v. United States*, 391 U.S. 123 (1968), and *Richardson v. Marsh*, 481 U.S. 200 (1987). The motions judge, recognizing the prejudice of those statements fingering Greene, thought she could cancel out that prejudice by simply redacting Greene's name when the statements were read to the jury and giving a limiting instruction to the jury.

*Bruton* (as clarified in *Richardson*) was not enough to win the point for Greene. He remained short of the winning line on his appeal when the Pennsylvania Superior Court ruled on December 16, 1997, that *Bruton* was not violated.

But there was hope, as Greene filed timely a petition for allowance of review to the Pennsylvania Supreme Court. That hope received a big boost when the Supreme Court of the United States decided *Gray v. Maryland*, 523 U.S. 185 (1998), while his petition was pending. *Gray* held that redacting names from confessions using obvious blanks falls within the class of claims protected by *Bruton*. This was good news indeed for Greene. The Pennsylvania Supreme Court would no doubt take note of

2

*Gray* and grant review.

Indeed it did, and it did so on the very issue decided by *Gray*. Yet for reasons we do not know, it abruptly dismissed its grant of appeal as "having been improvidently granted," in effect leaving in place post-*Gray* the Superior Court's pre-*Gray* decision on Greene's Confrontation Clause rights.

Greene filed a petition seeking collateral relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541–46. He did not allege that his Confrontation Clause rights were violated (and thus did not cite *Bruton* or *Gray*), ostensibly because the PCRA proscribes relitigating matters already dealt with on direct appeal. 42 Pa. Cons. Stat. Ann. § 9543(a)(3). Nonetheless, my colleagues state that, had he done so, Greene would have "obtained a later, post-*Gray* state-court decision on the merits." Maj. Op. at 43. They claim—incorrectly, I believe, for the reasons stated more fully in note 13 below—that failure to raise *Gray* in his PCRA petition "shrank the universe of 'clearly established Federal law' available to him for his § 2254 petition." *Id.* at 39–43. They say this while conceding that "Greene fairly presented the factual and legal substance of his Confrontation Clause claim to the Pennsylvania state courts." *Id.* at 17. We do not consider federal claims procedurally defaulted, "even if the procedural rule is theoretically applicable to [the] facts," unless the last state court rendering a judgment in the case "clearly and expressly states that its judgment rests on a state procedural

3

bar." *Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004) (citations omitted). There is no clear or express statement here.

Greene's frustrating failure with the Pennsylvania court system was over, but all was not lost. He thought he could seek *habeas* review of his Confrontation Clause rights in a federal court. And he did.

This is where we come in after the District Court ruled against Greene: were his Confrontation Clause rights "clearly established [as] Federal law" when they were "adjudicated on the merits in State court proceedings"? 28 U.S.C. § 2254(d)(1). The answer is yes if we look to all United States Supreme Court decisions before his conviction became final,[2] but no if we stop with the decision of the Pennsylvania Superior Court less than two and a half months before the *Gray* decision. Greene is in the unwelcome twilight zone where, in the United States Supreme Court's own words, "uncertainty" currently exists. *Smith v. Spisak*, 558 U.S. ___, 130 S. Ct. 676, 681 (2010).

---

[2] Finality means that "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith*, 479 U.S. at 321 n.6.

4

## II.     Analysis

This is not a situation where Greene is seeking to take belated advantage of a rule to which he is not entitled. He is asking us to apply a case that should have been applied on direct review. Under the Supreme Court's *Griffith* jurisprudence, he was entitled to the benefit of *Gray*. It is only because the Pennsylvania state courts failed to apply it to his case that we are evaluating it in the first instance on *habeas* review.

My analysis differs from that of the majority. In a nutshell, subsection 2254(d)(1) does not choose any cutoff date. Thus, we are left with the retroactivity jurisprudence of *Griffith* and *Teague*. Because *Gray* was decided prior to the date Greene's conviction became final, I believe *Griffith* requires its application to this case. I would therefore reverse the judgment of the District Court and remand for consideration of *Gray*.[3]

---

[3] Directing the District Court to consider *Gray* does not mean that Greene would get *habeas* relief. The Pennsylvania state courts may have applied Pennsylvania's own existing Confrontation Clause jurisprudence that was not contrary to, or an unreasonable application of, the constitutional rule announced in *Gray* even though *Gray* did not yet exist. AEDPA does not allow a writ of *habeas corpus* to be granted for simple errors of law; a writ is granted only when there is an unreasonable error of law. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., for the Court) ("[A]n *unreasonable* application of federal law is different from an

**A.** **As noted, the question of whether § 2254(d)(1) sets a cutoff date is unresolved.**

I agree with the majority that "clearly established Federal law" did not have any special meaning prior to AEDPA and the text of 28 U.S.C. § 2254(d)(1). *See* Maj. Op. at 29 n.10. Nor does the text of 28 U.S.C. § 2254(d)(1) have an express time cutoff for "clearly established Federal law." My colleagues read the statute implicitly to require that any Supreme Court decision handed down after the relevant state-court decision on the merits is to be ignored for purposes of *habeas* relief. I disagree that "[r]eading the language plainly," or in a "straightforward" way, as my colleagues suggest, requires that the Supreme Court decision exist at the time of the state court's substantive resolution. If § 2254(d)(1) were so plain or straightforward, why does the Supreme Court say it is uncertain? And why are my colleagues of the view that "there is no clear answer to the issue we face"? Maj. Op. at 25 n.7. In the face of such uncertainty, I find it difficult to conclude that there is a "natural reading" of § 2254(d)(1) dictating a cutoff date.[4]

_____

*incorrect* or *erroneous* application of federal law." (emphasis in original)).

[4] One might think this is the paradigm for invoking the rule of lenity. If even the Supreme Court is uncertain which time trigger is in play as to when federal law is "clearly established," it seems fair that, while others may in the future lose in the twilight zone, Greene should not. As that is not how the

A primary reason for the Supreme Court's uncertainty as to whether the text of § 2254(d)(1) provides a clear cutoff date is its own decision in *Williams v. Taylor*, 529 U.S. 362 (2000). Inadvertently (no doubt), the Court had two different majorities identifying two different cutoffs.[5]  Justice Stevens, writing for six members of the Court in Part III of his opinion, stated that the applicable date for purposes of determining whether federal law is established is "the time [the *habeas* petitioner's] state-court conviction became final."  529 U.S. at 390 (Stevens, J., for the Court).  Justice O'Connor, writing for five members of the Court in Part II of her opinion, stated that "'clearly established Federal law' . . . refers to the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id.* at 412 (O'Connor, J., for the Court). Neither Justice Stevens nor Justice O'Connor appears to have chosen a cutoff based on the text of the statute, and they did not acknowledge the discrepancy in their respective opinions. Indeed, in *Williams* the choice of cutoff would not have mattered because the case focused on *Strickland v. Washington*,

majority rules, Greene's claim to *Gray*'s benefits becomes simply sisyphean.

[5] The fractured decision had Justice Stevens announcing the judgment of the Court and delivering the opinion of the Court (6 votes) with respect to Parts I, III, and IV of his opinion, and a minority opinion (4 votes) with respect to Parts II and V.  Justice O'Connor delivered the opinion of the Court (5 votes) with respect to Part II of her opinion (save for a footnote).

7

466 U.S. 668 (1984), a case decided prior to both the 1985 crime and the 1986 conviction in *Williams*, making the discussion of cutoff *dicta* because under both cutoffs *Strickland* was undoubtedly "clearly established Federal law."

Our task is to reconcile the conflicting majorities in *Williams* regarding the cutoff for "clearly established Federal law" under AEDPA while maintaining consistency with the Court's controlling decisions in *Griffith* and *Teague*. Recently, the Supreme Court recognized the "uncertainty" in temporal cutoff for "clearly established Federal law," and declined to resolve it at that time. *See Spisak*, 130 S. Ct. at 681.[6]

Recognizing the Court's statement in *Spisak* as the "most telling observation regarding the use of the date the conviction became final," my colleagues dismiss it in a single sentence as "mere uncertainty [that] cannot counterbalance" the cases that

_____

[6] Like this case, the timeline of *Spisak* has a "new rule" falling in the twilight zone between the last state-court decision on the merits and the date of finality. There, the last state-court decision on the merits was issued on April 13, 1988. *State v. Spisak*, 521 N.E.2d 800 (Ohio 1988); *see also Spisak v. Mitchell*, 465 F.3d 684, 688 (6th Cir. 2006). The conviction became final on March 6, 1989, when the Supreme Court of the United States denied *certiorari*. *Spisak v. Ohio*, 489 U.S. 1071 (1989). *Mills v. Maryland* was decided on June 6, 1988, in the period between the last state-court decision on the merits and the date of finality. 486 U.S. 367 (1988).

8

select the date of the relevant state-court decision. Maj. Op. at 31. Moreover, they do so even though we agree that Supreme Court has never conducted a thorough analysis of the "clearly established" cutoff for AEDPA. *Id.* at 26–27. Though the Supreme Court has used the relevant state-court decision as the temporal cutoff in cases after *Williams*, I do not find this dispositive. Like our own checkered jurisprudence, it is not clear from the Supreme Court's cases whether it recognized these divergent approaches inasmuch as it was not required in those cases to resolve whether the cutoff date was the relevant state-court decision date or the date the conviction became final.[7]

---

[7] The majority makes this observation with respect to our own precedent, yet does not reach the same conclusion with respect to the Supreme Court's rulings. In none of the cases cited by the majority as adopting the date of the relevant state-court decision was the Supreme Court required to determine the cutoff date, and in the only case where it had to confront the issue, *Spisak*, it sidestepped. We are not free to ignore that the Court itself has told us the law is "uncertain." I caution that I do not take "mere uncertainty" alone to "counterbalance the numerous Supreme Court decisions," but instead take the Supreme Court's express reservation of the question in *Spisak* as telling us that the issue remains unresolved and that there is little to be gleaned from other cases that, as the majority notes, take one approach "without analysis." Maj. Op. at 31. In that respect, the Supreme Court's § 2254(d)(1) precedent is like our precedent: it goes both ways and is unhelpful in resolving an inquiry that the decisions did not squarely address. Moreover,

9

If, as the majority suggests, the clear answer is the date of the relevant state-court decision, the *Spisak* Court would not have noted the uncertainty, nor would it have assumed the date of finality. The Court is not in the business of offering advisory opinions, and if it were clear that its prior cases had selected the date of the relevant state-court decision, it would not have issued the opinion in *Spisak*. It would have held instead that, because *Mills* was decided after the final state-court decision on the merits, AEDPA did not permit consideration of the case. It would have stopped its analysis there instead of going on at great length to evaluate the *Mills* claim on the merits. Thus, post-*Williams* Supreme Court precedent offers little to clarify the temporal cutoff for "clearly established Federal law" under AEDPA.

### B.    The Supreme Court has not abandoned its retroactivity jurisprudence post-AEDPA.

AEDPA's concern over whether a state court ruling in a criminal case was contrary to, or an unreasonable application of, "clearly established Federal law" stems from the desire to avoid disturbing final criminal judgments through collateral review. In particular, the use of the past tense ("established") means that AEDPA is concerned with the law that should have been applied at the time of the state court proceedings. Where I diverge from

the selection of a cutoff date in Supreme Court cases is no more than *dicta*.

my colleagues is how we determine what that body of law is.

Even though at first it seems conceptually difficult to say that a court unreasonably applied Supreme Court precedent that did not yet exist, retroactivity analysis becomes the tool for deciding. When a Supreme Court holding is retroactively applied to a prior proceeding, it is as if it existed at the time of that prior proceeding. The majority's view ignores controlling Supreme Court precedent that allows, in certain circumstances, for the retroactive application of constitutional rules to criminal cases even though they are announced after a state court ruling on the merits.

Paramount to understanding the Supreme Court's retroactivity jurisprudence is discerning its decisions in *Griffith* and *Teague*. They provide a distinction between "old rules" and "new rules," terms that have a clear meaning only when used in relation to a given criminal conviction. Unhelpfully, the Supreme Court has used "new rule" to mean different things in the *Griffith* and *Teague* context.

A "new rule" for *Griffith* is one that is announced after a state court ruling on the merits. A "new rule" for *Teague* is one that is announced after a conviction becomes final. This means that in the application of *Gray* to Greene's conviction, *Gray* is a "new rule" for *Griffith* purposes but is an "old rule" for *Teague* purposes. We are principally concerned with the *Teague* distinction between "old rules" and "new rules." The

11

following table may aid in understanding the discussion that follows.

| Date of Supreme Court Decision (relative to the criminal conviction) | Old or New for *Teague*? | Applicable to criminal case? | Majority reading of § 2254(d)(1) "clearly established Federal law" |
|---|---|---|---|
| Before the last state-court decision on the merits on direct review | Old rule under *Teague* because it is pre-finality | Yes, because it is/was existing precedent (direct appeal and collateral review) | Yes, because it was existing precedent on direct review |
| After the last state-court decision on the merits on direct review, but before finality | Old rule under *Teague* because it is pre-finality | Yes, because *Griffith* makes it applicable (direct appeal and collateral review) | No, because it post-dates the state-court decision |

12

| Date of Supreme Court Decision (relative to the criminal conviction) | Old or New for *Teague*? | Applicable to criminal case? | Majority reading of § 2254(d)(1) "clearly established Federal law" |
|---|---|---|---|
| After finality | If dictated by pre-finality precedent, old rule under *Teague*. Otherwise, new rule under *Teague*. | Maybe under *Teague*; only applicable if a narrow exception is met, or was dictated by pre-finality precedent (collateral review) | No, because it post-dates the state-court decision |

> **C. The Supreme Court has a developed jurisprudence governing the application to cases on collateral review of its cases decided pre-finality and those decided post-finality.**

The retroactive application of newly announced constitutional rules in criminal cases has long troubled the

13

Supreme Court. As noted, retroactivity takes that rule and transports it back in time to a proceeding that pre-dated the announcement of the rule, treating the rule as if it existed at the time of the prior proceeding. Because this fiction has the potential to upset settled proceedings, especially in the criminal context, over the years the Court came to adopt a bright-line that splits the application of these rules into two domains of review.

Whether a new rule applies retroactively depends on whether a criminal conviction is on direct review or collateral review at the time of the Supreme Court decision announcing the new rule. If the conviction is on direct review when the new rule is announced, *Griffith* allows the retroactive application of the new rule to all criminal cases pending on direct review as a "basic norm[] of constitutional adjudication." 479 U.S. at 322. If the conviction is on collateral review when the new rule is announced (*i.e.*, convictions that became final before the new rule is announced), *Teague* restricts the application of that new rule to narrow exceptions discussed below. This bright-line distinction was made due to the differing considerations between the two domains of review.

### 1.    *Griffith*

The *Griffith* Court held that the "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." 479 U.S. at 322. It was the very "integrity of judicial review" that

14

required application of a new constitutional rule "to all similar cases pending on direct review." *Id.* at 323. Two principles guided this decision. First, the Court recognized that

> [a]s a practical matter, of course, we cannot hear each case pending on direct review and apply the new rule. But we fulfill our judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final. Thus, it is the nature of judicial review that precludes us from "[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule."

*Id.* (citation omitted). Second, the Court recognized that

> selective application of new rules violates the principle of treating similarly situated defendants the same. As we pointed out in *United States v. Johnson*, the problem with not applying new rules to cases pending on direct review is "the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary" of a new rule. Although the Court had tolerated this inequity for

15

> a time by not applying new rules retroactively to cases on direct review, we noted: "The time for toleration has come to an end."

*Id.* (citations omitted) (emphasis in original). The Court therefore held "that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328. I note that "pending on direct review" is slightly different from "not yet final." A case that has already exhausted the direct appeal as of right resulting in a state-court decision on the merits, but is not yet final, is still within the purview of *Griffith*. Finality is the key date.

The *Griffith* Court "instruct[ed] the lower courts," state and federal, "to apply the new rule retroactively to cases not yet final." *Id.* at 323. It did not merely advise those courts to consider applying the rule subject to their discretion, but mandated application of the new rule. It was only through this mandate that "*actual inequity*" between "many similarly situated defendants" would be avoided.[8]

---

[8] For instance, it would undermine the integrity of judicial review if among ten similarly situated criminal defendants—all duly convicted in state court, all having only the petition for *certiorari* to the Supreme Court of the United States as their remaining recourse on direct appeal, and all raising the same question of constitutional law—only one were permitted to

16

### 2. *Teague*

In *Teague*, the Supreme Court dealt with the other side of the retroactivity question. Collateral attacks such as *habeas corpus* are not meant to be a substitute for direct review, and the Court has recognized an interest in leaving concluded litigation in a state of repose. 489 U.S. at 306 (*quoting Mackey v. United States*, 401 U.S. 667, 682–83 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)). Quoting the second Justice Harlan, the Court noted that it was "'sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of [*habeas*] cases on the basis of intervening changes in constitutional interpretation.'" *Id.* (*quoting Mackey*, 401 U.S. at 689 (Harlan, J.) (alteration in original)). The Court identified only two exceptions to the general prohibition against the retroactive application of new post-finality rules to cases on collateral review: (1) new rules that place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, *id.* at 307; and (2) new "watershed rules of criminal procedure . . . [that] 'alter our understanding of the *bedrock procedural elements* that must be

---

benefit from a new rule, leaving the other nine to "flow by unaffected by that new rule." *Griffith*, 479 U.S. at 323 (citation omitted). It is to avoid this inequality between a lucky defendant and an unlucky (but similarly situated) defendant that *Griffith* draws its bright line and requires application of the new rule.

17

found to vitiate the fairness of a particular conviction,'" *id.* at 311 (emphasis in original) (citation omitted).

In deciding *Griffith* and *Teague*, the Supreme Court has carefully set out the different concerns in the pre-finality (direct appeal) and post-finality (collateral attack) application of new rules. In the context of retroactivity for federal *habeas* review, the *Teague* Court focused on the distinction between intermediate judgments subject to appeal and final judgments subject only to collateral attack:

> Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect. The fact that life and liberty are at stake in criminal prosecutions "shows only that 'conventional notions of finality' should not have *as much* place in criminal as in civil litigation, not that they should have *none*."

*Id.* at 309 (emphases in original) (citation omitted). With this view of finality, the Court held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," using

18

finality, not the date of the relevant state-court decision, as the inflection point between *Griffith* and *Teague*. *Id.* at 310.

### D. Section 2254(d)(1) does not discard *Griffith* and *Teague*.

In a unanimous post-AEDPA and post-*Williams* decision, *Whorton v. Bockting*, 549 U.S. 406 (2007), the Supreme Court held that *Griffith* and *Teague*

> laid out the framework to be used in determining whether a rule announced in one of [the Court's] opinions should be applied retroactively to judgments in criminal cases that are already final on direct review. Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review. *See Griffith*, 479 U.S. 314.[9] A new rule applies

---

[9] The Supreme Court here meant "old rule" (pre-finality) and "new rule" (post-finality) for *Teague* purposes. I disagree with my colleagues when they state that "[t]he sentence following the *Griffith* citation in the *Whorton* decision further confirms [its] understanding by explaining how new rules apply in collateral proceedings through citation to *Teague*, not *Griffith*." Maj. Op. at 37. This case is not about "extending" *Griffith* to collateral review or "import[ing]" *Griffith* into *Teague*. This case is not even about "new rules"—it is about "old rules," meaning all pre-

19

finality Supreme Court precedent. The majority takes issue with applying "old rules" to collateral review, but if "old rules" do not apply on collateral review, which rules do? *Griffith* defines the body of law that should be applied on direct review, that is, all precedent that is decided prior to a conviction's finality. This relates to collateral review because *habeas* is concerned with what body of law should have been applied on direct review. The relation of *Griffith* to collateral review is nothing novel or profound.

As my colleagues concede, Maj. Op. at 34, a rule that is handed down pre-finality is an *old rule* and need not pass the *Teague* test. Instead, it is governed by *Griffith* and is applicable "both on direct and collateral review." *Whorton*, 549 U.S. at 416. Furthermore, the Supreme Court has applied *Griffith*'s retroactivity principle in the *habeas* context, giving *habeas* petitioners the rights established by all Supreme Court decisions that pre-date a conviction's finality:

> Penry's conviction became final on January 13, 1986, when this Court denied his petition for certiorari on direct review of his conviction and sentence. This Court's decisions in *Lockett v. Ohio* and *Eddings v. Oklahoma* were rendered before his conviction became final. Under the retroactivity principles adopted in *Griffith v. Kentucky*, Penry is entitled to the benefit of those decisions.

*Penry v. Lynaugh*, 492 U.S. 302, 314–15 (1989) (citations

20

> retroactively in a collateral proceeding only if [the *Teague* requirements are met].

549 U.S. at 416.[10]  Though *Whorton* dealt with an application of

_____

omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

We have likewise done so in our own *habeas* cases, applying pre-finality decisions on *habeas* review under the authority of *Griffith*. *See, e.g. Lewis v. Horn*, 581 F.3d 92, 102 n.5 (3d Cir. 2009) ("Although Abu-Jamal, like Lewis, was convicted prior to the Supreme Court's decision in *Batson*, his direct appeal was still pending when the Supreme Court decided *Batson*, and therefore *Batson* applied retroactively to his case." (*citing Griffith*, 479 U.S. at 328)); *Simmons v. Beyer*, 44 F.3d 1160, 1164–65 (3d Cir. 1995) ("Had Simmons received a timely review, his conviction would have been final before 1986.  In a sense, he is a 'chance beneficiary' of the *Batson* rule . . . [, but] we see no reason to bend the rule in *Griffith* to deny Simmons the constitutional protection afforded in *Batson*." (*citing Griffith*, 479 U.S. at 323)).

[10] In *Whorton*, the Court analyzed whether *Crawford v. Washington*, 541 U.S. 36 (2004), a case that was decided after the *habeas* petitioner's conviction was final, was applicable to his case as a "new rule."  Implicit in the analysis is the recognition that cases decided after the last state-court decision on the merits may nonetheless be applicable to cases under AEDPA so long as they meet the appropriate retroactivity test.  Otherwise there would be no need to consider whether *Crawford*

21

*Teague*, it explicitly recognized that *Griffith* requires that "old rules" be applied both on direct *and collateral* review.[11]  To me this means that the *Whorton* Court unanimously endorsed *Griffith* and the idea that a Supreme Court decision handed down after the last state court ruling on the merits, but before finality, is an old rule that is applicable even under AEDPA and even if it is not a "watershed" ruling or places conduct beyond the power of the state to proscribe.

Given the Court's retroactivity concerns, I believe the better reading of § 2254(d)(1) is that it does not set a definitive cutoff date for "clearly established Federal law."  It is the Supreme Court's retroactivity jurisprudence of *Griffith* or *Teague* that determines applicability on collateral review, not AEDPA.

My colleagues' reading of § 2254(d)(1) conflicts with *Whorton*.  They refuse to include all "old rules" as "clearly established Federal law."  This reading contradicts the unanimous holding in *Williams* that all "old rules" for *Teague*

applied because it did not exist at the time of the last state-court decision on the merits.

[11] As noted above, an "old" rule is any rule that existed prior to finality or was dictated by the governing precedent at the time of finality.

22

purposes are "clearly established Federal law."[12] My colleagues recognize this contradiction, but they choose to ignore *Griffith* and *Teague* and adopt Justice O'Connor's initial unreasoned declaration (that chose the date of the relevant state-court decision and cited no case) and not her later reasoned one (that referred to "old rules" under *Teague* and cited Supreme Court precedent). *See* 529 U.S. at 412 (*citing Stringer v. Black*, 503 U.S. 222, 228 (1992)). It is unclear to me why we would choose her statement of the law (a *dictum*, no less) in conflict with the Supreme Court's decisions in *Griffith* and *Teague* instead of her statement of the law in harmony with those Supreme Court holdings and *Whorton* (and that actually invokes the controlling Supreme Court precedent of *Teague*).

---

[12] Notwithstanding the apparent conflict in time cutoff in *Williams*, Justice O'Connor and Justice Stevens did agree that "whatever would qualify as an old rule under [the Court's] *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1)." 529 U.S. at 412 (O'Connor, J., for the Court (joined by Rehnquist, Kennedy, Thomas, & Scalia, JJ.)); *see also id.* at 379–81 (Stevens, J., 4-vote portion (joined by Souter, Ginsburg, & Breyer, JJ.)) (distinguishing "new rules" from "clearly established" rules). In other words, the court was unanimous in holding that all "old rules" under *Teague* constitute "clearly established Federal law" under AEDPA.

## E. The majority's cutoff creates a twilight zone

If the relevant cutoff date is the date of the last state-court decision on the merits, we would create a twilight zone for criminal defendants. Consider the possible times relative to a state court conviction when a decision by the Supreme Court is announced: (1) prior to the last state-court decision on the merits; (2) between the last state-court decision on the merits and finality; and (3) after the conviction is final. If it were decided in the first period (prior to the last state-court decision on the merits), a state court would have to apply it to be consistent with *Griffith*. If it were decided in the third period (after finality), *habeas* relief would be available as a "new rule" under *Teague* if the decision announced a "watershed" rule or placed certain conduct beyond the power of the state to proscribe. However, if it were decided in the second period (the twilight zone between the last state-court decision on the merits and before finality), the majority's time cutoff would nonetheless consider it not to be "clearly established Federal law" and would bar *habeas* relief because the rule did not exist at the time of the last state-court decision on the merits. The majority reaches this conclusion even though, as discussed above, a rule announced pre-finality is an "old rule" for *Teague* purposes and *Griffith* requires its application on direct and collateral review.[13]

---

[13] As noted above, the majority states that Greene could have raised a *Bruton* Confrontation Clause claim on PCRA review,

thereby receiving a *post-Gray* state-court decision on the merits. Maj. Op. at 39 & n.12. I believe this is not correct. The PRCA entitles state prisoners to relief only if they plead and prove an allegation of error that "has not been previously litigated or waived." 42 Pa. Cons. Stat. Ann. § 9543(a)(3). Greene had previously litigated his Confrontation Clause claim on direct appeal and thus could not bring a PCRA action.

"[A]n issue has been previously litigated if . . . the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2). "Whether an issue was previously litigated turns on whether '[the issue] constitutes a discrete legal ground or merely an alternative theory in support of the same underlying issue that was raised on direct appeal.'" *Commonwealth v. Small*, 980 A.2d 549, 569 (Pa. 2009) (alteration in original); *see also Commonwealth v. Collins*, 888 A.2d 564, 570 (Pa. 2005). Furthermore, citing to different authority for the same issue "does not change the fact [that] th[e] issue was previously litigated. To hold otherwise would mean a PCRA petitioner could raise an issue on direct appeal, and raise it again in a PCRA petition merely by citing a different case to support the original theory." *Small*, 980 A.2d at 569.

My colleagues and I agree that Greene has not procedurally defaulted his *Bruton* claim, having raised it on direct appeal. We agree that he litigated his *Bruton* claim in the Pennsylvania Superior Court. We agree that the Superior Court ruled on the merits of this claim. We agree that he raised it in

25

his petition for allowance of appeal with the Pennsylvania Supreme Court. In other words, there can be no dispute that the *Bruton* claim was "previously litigated" for purposes of the PCRA. While my colleagues suggest that *Gray* was a discrete legal ground because it answered the question left open in *Marsh* regarding pronoun or symbol substitutions, the fact remains that the Pennsylvania Superior Court directly addressed the issue of pronoun substitutions in Greene's direct appeal. App. 990 (Pa. Super. Ct. Op.) (*citing Commonwealth v. Miles*, 681 A.2d 1295, 1300 (Pa. 1996)). Though *Gray* was decided later, the "discrete legal ground" was before the Superior Court and it decided that issue. In any event, to the extent that my colleagues believe that the Pennsylvania courts might have relaxed their PCRA standards to allow Greene to make the claim, that is pure speculation.

A similar situation arose in another Pennsylvania case cited by the Commonwealth. *Commonwealth v. Washington*, 927 A.2d 586, 608–09 (Pa. 2007). There, Washington unsuccessfully raised a *Bruton* claim very similar to Greene's at trial and on direct appeal to the Pennsylvania Supreme Court. Subsequent to Washington's conviction becoming final, *Gray* was decided. On PCRA review, he invoked *Gray*, reasserted his *Bruton* claim, and argued that it was not previously litigated. The Pennsylvania Supreme Court rejected this argument and held the *Bruton* claim "previously litigated because [it] reviewed the claim and ruled on the merits of the issue" on direct appeal. *Id.* at 609. Likewise, Greene could not raise the claim in his PCRA petition as the majority suggests he should have done. He had pursued his colorable *Bruton* claim based on federal law

26

So inflexible is the "plain reading" the majority adopts that even "new rules" that pass the *Teague* test for retroactive application would not entitle a petitioner to *habeas* relief. "New rules" for *Teague* purposes are always decided after the date of the relevant state-court decision, as they come into being after finality. Yet the majority would not consider the "new rule" to be "clearly established Federal law" because the "new rule" did not yet exist, and no relief could be granted.[14] Such a Catch-22

"as far as possible in the state courts." *See* Maj. Op. at 43.

Of course, the issue is not whether *Washington* is factually on point with Greene's case, or whether it is theoretically possible that Greene could have raised a claim based on *Gray* on PCRA review, but whether the meaning of "clearly established Federal law" under § 2254(d)(1) means different things in different cases depending on the availability of state collateral review. What my colleagues essentially hold is that when a defendant has "previously litigated" a novel constitutional claim on direct appeal, but the Supreme Court recognizes the constitutional rule in a different case before his conviction becomes final, he has no federal *habeas* recourse if the state courts do not apply the constitutional rule to his case on direct review and the state collateral process prohibits him from re-raising the claim.

[14] Although another portion of AEDPA, 28 U.S.C. § 2244(d)(1)(C), resets the one-year period of limitation when the Supreme Court newly recognizes a constitutional right and makes it retroactively applicable to cases on collateral review,

27

reading of § 2254(d)(1) effectively disregards *Griffith* and *Teague* even as the Supreme Court has maintained that both decisions remain viable.[15]

---

it is § 2254(d)(1) that governs the substantive power of the federal courts to grant a federal remedy to defendants in state custody. Section 2254(d)(1) states that the writ of *habeas corpus* "shall not be granted" unless it was contrary to, or involved an unreasonable application of, "clearly established Federal law." The majority's reading of § 2254(d)(1) means a new rule that satisfies *Teague* and is made retroactively applicable to cases on collateral review would not be *time-barred* by § 2244, but a federal court would still be powerless to grant relief under § 2254. Thus, if a watershed decision such as *Gideon v. Wainwright*, 372 U.S. 335 (1963), were to come down tomorrow as a "new rule," under the majority's holding one would be entitled to *file* for *habeas corpus*, but would not be entitled to *habeas relief*. The majority's reading of § 2254(d)(1) obviates the need for § 2244(d)(1)(C).

[15] In fact, the Supreme Court reversed our Court when we called into question the continuing relevance of *Teague*. *Horn v. Banks*, 536 U.S. 266, 272 (2002), *rev'g Banks v. Horn*, 271 F.3d 527 (3d Cir. 2001). The Supreme Court instead held the AEDPA and *Teague* inquiries to be distinct and required federal courts to address *Teague* when properly raised. *Id.* There appears to be additional confusion in the majority opinion when it suggests that I "would *sub silentio* codify *Teague*." Maj. Op. at 33. But I agree that AEDPA and *Teague* are distinct inquiries—AEDPA is concerned with the unreasonableness of the state court decision, while *Teague* is concerned with the

28

As discussed above, even though at first it seems conceptually difficult to say that a state court unreasonably applied Supreme Court precedent that did not yet exist, the Supreme Court's retroactivity analysis treats the precedent as if it existed at the time of that prior state court proceeding. Under *Griffith*, Supreme Court decisions are retroactively applied to those convictions not yet final at the time of the decision. Furthermore, if the state court neglects to apply the rule retroactively to convictions not yet final, this can be still corrected after finality on collateral review. *See Whorton*, 549 U.S. at 416 ("[O]ld rule[s] appl[y] both on direct *and collateral* review." (emphasis added)). Under *Teague*, Supreme Court decisions are retroactively applicable even to convictions that were already final at the time of the decision if it announces a "watershed" rule or places certain conduct beyond the power of the state to proscribe. We know from *Whorton* that § 2254(d)(1) does not overrule *Griffith* and *Teague*, but by deeming irrelevant any case that post-dates the relevant state-court decision, the majority implicitly disregards both *Griffith* and *Teague*.

yardstick we use to measure unreasonableness. Satisfying *Teague* may make a Supreme Court decision retroactive and "clearly established Federal law," but it does not necessarily mean that a state court decision was unreasonable. Likewise, if the relevant state-court decision is rendered post-finality (in the case of a state-court decision rendered during collateral review), *Teague* may still operate as a bar to federal *habeas* relief if the relevant Supreme Court decision is also post-finality. Even under my reading, AEDPA and *Teague* are distinct inquiries.

29

While another Circuit Court has rejected the majority's cutoff on fears of the potential for "state court . . . subver[sion] . . . by the simple expedient of summarily affirming a lower court's decision," *Foxworth v. St. Amand*, 570 F.3d 414, 432 (1st Cir. 2009), its reasoning does not depend on a distrust of the judicial integrity of state courts. A well-meaning state court system could innocently neglect to apply *Griffith* after its final decision on the merits, but before the conviction becomes final. If a state court were to ignore the mandate to apply the new rule to all cases still pending on direct appeal or not yet final, it would similarly undermine the integrity of judicial review. That would leave collateral review by *habeas corpus* as the only remedy to correct the mistake. Surely a criminal defendant is entitled to recourse if the state courts simply forget to check for new, relevant Supreme Court precedent prior to finality.[16] This helps to avoid the situation where similarly situated defendants receive disparate treatment based on the happenstance of state

---

[16] To the extent that a defendant is not constitutionally entitled to counsel on discretionary appeals, it seems unreasonable to expect that defendant, who is likely incarcerated, to be fully abreast of Supreme Court rulings and the first person to bring intervening Supreme Court decisions to the attention of the state courts within the window for discretionary review. The state courts have an independent obligation under *Griffith* to ensure the application of intervening Supreme Court decisions to all cases that are not yet final.

court attention (or inattention).[17]

Yet, under the majority's selection of temporal cutoff, even that remedy would be foreclosed whenever the state courts declined to apply the rule without explanation.  This would leave affected *habeas* petitioners as unfairly treated relative to other similarly situated individuals who were lucky enough to have the state courts apply the new rule.

\* \* \* \* \*

It is not our place to second-guess the Supreme Court when it has held that: (1) Supreme Court decisions handed down prior to finality must be applied on both direct and collateral review under *Griffith*; (2) *Teague* and *Griffith* have continuing vitality after AEDPA; (3) all nine Justices in *Williams* agreed

---

[17] It is important to note that retroactively applying (under *Griffith*/*Teague*) Supreme Court decisions announced after the last state-court decision as "clearly established" does not impugn the state court that fails to predict a later Supreme Court ruling.  After all, a state court is not faulted when *Griffith* directs the application of a "new rule" to cases that are not yet final, but already adjudicated on the merits.  In that instance, the state court need only apply the rule to pending cases.  Nor does it demonstrate a mistrust of state courts when *Teague* directs the application of a "new rule" to cases that are already final.  Again, to fulfill their judicial obligations, state courts need only apply the retroactive rule to the affected cases.

31

that an "old rule" under *Teague* qualifies as "clearly established Federal law"; and (4) its decisions since *Williams* have not definitively set a temporal cutoff. In the absence of an express statement to the contrary by the Supreme Court (and there is none), we are bound to apply the clearly expressed (and still controlling) jurisprudence of *Griffith* and *Teague*. The Court may wish, in the AEDPA context, to cut back on *Griffith* and *Teague*, but it, not us, possesses the power to overrule its precedent.

I would hold that the cutoff date for "clearly established Federal law" is not prescribed by 28 U.S.C. § 2254(d)(1). The retroactive application of constitutional rules to criminal cases is governed by *Griffith* and *Teague*, and I would look first to whether *Gray* was decided before or after finality to determine which rule applies. As here *Gray* was decided prior to finality, the Pennsylvania Supreme Court should have considered it in the course of fulfilling its responsibilities under *Griffith*. When it did not do so, the District Court on *habeas* review needed to correct this failure to consider *Gray*. Accordingly, I would vacate its judgment and remand for application of *Gray* to Greene's Confrontation Clause claim. For these reasons, I respectfully dissent from all but Part II of the majority opinion.

32